## UNITED STATES DISTRICT COURT FOR
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **ROBERT HARPIN** | : | |
| **Litchfield, CT 06759** | : | **CIVIL ACTION NO.** |
| **Plaintiff,** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **BOSTON SCIENTIFIC** | : | |
| **CORPORATION** | : | |
| **300 Boston Scientific Way** | : | |
| **Marlborough, MA 01752** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## COMPLAINT

### I.    INTRODUCTION

Plaintiff Robert Harpin ("Plaintiff") brings claims for discriminatory and retaliatory termination against his former employer, Boston Scientific Corporation ("Defendant" or "BSC") after his wrongful termination in violation of the Americans with Disabilities Act, as amended, 42 U.S.C. §12101, *et seq.* ("ADA"), the Age Discrimination in Employment Act, as amended, 29 U.S.C. §621, *et seq.* ("ADEA"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.* ("Title VII"), the Family Medical Leave Act, *et seq.* ("FMLA")  and the Massachusetts Fair Employment Practices Act, M. G. L. c. 151B, *et seq.* ("Chapter 151B"). Plaintiff, a high performing director of Defendant's Aviation Unit, was subjected to discrimination by his supervisor. When he contracted Covid-19 resulting in long-haul Covid related medical conditions and need for medical leave and reasonable accommodations, he was further discriminated against leading him to complain of unlawful discrimination to Defendant.  Prior to

his complaints of discrimination, Plaintiff had never been told that his job performance or management style was lacking in any material way. When Plaintiff complained, Defendant did not conduct a meaningful investigation into Plaintiff's complaints of discrimination, but, instead, "investigated" Plaintiff and his management style.  His termination followed at the conclusion of the "investigation," with the Defendant telling Plaintiff that the "investigation" had reveleated to Defendant for the first time that he was a "toxic" manager.  Prior to his complaints, Plaintiff had, in fact, been lauded for his management style and had never been informed that he was "toxic." Plaintiff was replaced by a significantly younger, non-disabled, less qualified employee who had not complained of unlawful discrimination and retaliation.  Plaintiff seeks damages, including without limitation economic loss, compensatory damages, liquidated damages, punitive damages, attorneys' fees and costs and all other relief this Court deems appropriate.

## II.   <u>PARTIES</u>

1. Plaintiff, Robert Harpin, is an individual and a citizen of Connecticut.  He resides in Litchfield, CT 06759.

2. Plaintiff was born in 1955. Plaintiff is sixty-seven (67).

3. Defendant Boston Scientific Corporation is a Delaware Corporation. Defendant's principal place of business is 300 Boston Scientific Way, Marlborough, MA 91752.

4. Defendant is engaged in an industry affecting interstate commerce and regularly does business in the Commonwealth of Massachusetts.

5. At all times material hereto, Defendant maintained a location at 180 Hanscom Road, Bedford Massachusetts 01730.

6. At all times material hereto, Plaintiff worked for Defendant out of the 180 Hanscom Road location. Plaintiff also traveled globally for Defendant in the performance of his duties.

7.      At all times material hereto, Defendant employed more than twenty (20) employees and at least six (6) employees within the Commonwealth of Massachusetts.

8.      At all times material hereto, Defendant acted by and through authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Defendant and in furtherance of their business.

9.      At all times material hereto, Defendant was an "employer" within the meaning of the statutes which form the basis of this matter.

10.     At all times material hereto, Plaintiff was an "employee" of Defendant within the meaning of the statutes which form the basis of this matter.

### III.     JURISDICTION AND VENUE

11.     The causes of action which form the basis of this matter arise under the ADA, the ADEA, Title VII, the FMLA and Chapter 151B.

12.     The District Court has jurisdiction over Counts I-IV pursuant to 28 U.S.C. §1331.

13.     The District Court has jurisdiction over Count V pursuant to pursuant to 28 U.S.C. §1367.

14.     The District Court has jurisdiction over all counts pursuant to 28 U.S.C. §1332 since the amount in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interest and costs, and as there is complete diversity of citizenship as Plaintiff is a citizen of Connecticut and Defendant is a citizen of Massachusetts.

15.     Venue is proper in this District Court under 28 U.S.C. §1391(b) and 42 U.S.C. §2000e-5.

16.     On or about September 21, 2021, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), complaining of the acts of

discrimination alleged herein. Attached hereto and incorporated herein and marked as Exhibit "1" is a true and correct copy of the EEOC Charge of Discrimination (with personal identifying information redacted). The Charge of Discrimination was cross-filed with the Massachusetts Commission Against Discrimination ("MCAD").

17.     On or about March 22, 2022, the EEOC issued to Plaintiff a Dismissal and Notice of Rights for Plaintiff's EEOC Charge. Attached hereto and marked as Exhibit "2" is a true and correct copy of that notice (with personal identifying information redacted).

18.     Plaintiff has fully complied with all administrative prerequisites for the commencement of this action.

## IV.     FACTUAL ALLEGATIONS

19.     Plaintiff was hired by Defendant on or about March 6, 2017, as Director of Aviation.

20.     As Director of Aviation, Plaintiff was charged with managing all aspects of Defendant's global flight operations, including but not limited to, safety, training, maintenance, and security.

21.     In addition, Plaintiff was responsible for formulating and implementing safety management systems, processes and procedures and generally managing a business unit that supported global aviation operations servicing one-hundred and fifty-two (152) unique destinations per year.

22.     During the hiring process, Plaintiff was told by Defendant's CEO, Michael F. Mahoney ("Mahoney") (non-disabled)[1] (55) that he "did not care" if Plaintiff performed in-flight

_____

[1] Allegations as to age and disability status, other than Plaintiff's own, are made to the best of his information and belief.

pilot services for Defendant in addition to the other administrative and managerial job duties associated with the Director of Aviation position.

23.     Though it was not an essential function of Plaintiff's job, Plaintiff did perform in-fight pilot services for Defendant.

24.     An "FAA First Class Medical" certification is required by law to pilot aircraft.

25.     Plaintiff held a FAA First Class Medical when he was actively flying Defendant's aircraft.

26.     For pilots over age forty (40), a First-Class FAA Medical certification is valid for approximately six (6) months.  As a result, Plaintiff was subjected to significant medical screen every six (6) months of his employment with Defendant except as otherwise set forth herein.

27.     Plaintiff initially reported to Defendant's then General Counsel, Tim Pratt ("Pratt"). Pratt reported to Mahoney.

28.     Beginning in or about December, 2017, Plaintiff began reporting to Ed Mackey, Executive Vice President Global Operations ("Mackey").

29.     Plaintiff did not meet Mackey until in or about February 2018.

30.     Mackey did not have any role in hiring Plaintiff.

31.     Mackey is younger than Plaintiff.

32.     Mackey reports to Mahoney.

33.     Plaintiff routinely interacted with Mahoney.

34.     Mahoney's feedback about Plaintiff's performance was included in Plaintiff's performance evaluation each year.

35.     At all material times, Plaintiff had approximately between eight (8) and nine (9) direct reports and one additional employee who reported to him indirectly.  Plaintiff's direct reports included Ryan Kalled ("Kalled"), Pilot, Fellow (non-disabled) (37).

36.     Plaintiff was the oldest person in the Aviation unit.

37.     Plaintiff was the oldest employee reporting to Mackey and the oldest of Mahoney's second-level reports.

38.     Plaintiff consistently performed his job in an exemplary manner and routinely received positive performance reviews.

39.     Without exception, Plaintiff received merit raises and bonuses throughout his employment.

40.     In addition, and without limitation, Plaintiff:

   a.   Received internal and external recognition for keeping Defendant's Puerto Rico operations on track at 90-99% of routine in the days immediately following a devastating hurricane;

   b.   Increased Defendant's usage of its jet with efficiency to glowing praise from internal users resulting in cost and efficiency savings to Defendant;

   c.   Received a "BSC Recognize Success" distinction;

   d.   Achieved a carbon neutral footprint (a stated company goal) for his department, one of only two departments within the company to achieve that status; and

   e.   Achieved DE&I (Diversity, Equity and Inclusion) goals provided by the company through the creation of the "Dream Day" Program.

41.     In or about July 2020, when Plaintiff was sixty-five (65) years old, Mackey told Plaintiff "he wasn't supposed to ask [him] this" but "Mike" (referring to Mahoney) asked Mackey about his retirement plans so he was going to "ask [Plaintiff][about his retirement plans]."

42.     Mackey then asked Plaintiff when he planned to retire.

43.     Plaintiff understood Mackey to be asking him when he planned to retire because of his age at the time (65).

44.     The Defendant admitted to the EEOC that Mahoney asked Plaintiff about his retirement plans.

45.     At all material times, Plaintiff understood Mackey to consider Kalled to be a "successor" to him. Kalled appeared on the company's formal "succession" plans as a potential successor to Plaintiff.

46.     Kalled was aware that he was identified as a successor to Plaintiff.

47.     In or about November 2020, Plaintiff was exposed to a Covid-19 positive employee of Defendant.

48.     That same month, Plaintiff contracted Covid-19.

49.     During Plaintiff's infectious period with Covid, Plaintiff worked for Defendant—albeit remotely from his home office.

50.     By late November, though Plaintiff was no longer ill with an active viral infection of Covid-19, Plaintiff experienced several medical symptoms and conditions that generally fall into the category of "Long-Covid."

51.     Plaintiff's symptoms of his disability included but were not limited to the following: fatigue/exhaustion, shortness of breath, joint pain, nausea, changes to his ability to taste normally, and facial and skin pain.

52.     Mackey put tremendous pressure on Plaintiff to "get better" (something beyond Plaintiff's control), resulting in a negative impact to Plaintiff's health and resulting in stress.

53.     On or about November 19, 2020, Mackey told Plaintiff over Zoom that if Plaintiff didn't get better, he would "terminate [him] from this enterprise."

54.     Plaintiff shared Mackey's comment with his team and with Denise LaMirande Clark ("Clark"), Director Human Resources.

55.     Clark did not take any action upon learning of Mackey's threat to terminate Plaintiff because of his serious medical condition.

56.     Clark did not take any action to protect Plaintiff form further discrimination and retaliation upon learning of Mackey's threat to terminate Plaintiff because of his serious medical condition.

57.     Plaintiff's FAA Medical expired on or about November 30, 2020.

58.     Plaintiff was not able to renew his FAA Medical in advance of the expiration date because of his active viral infection with Covid-19.

59.     On or about December 16, 2020, Plaintiff went to a medical appointment necessary for Plaintiff to renew his FAA Medical.

60.     Plaintiff was not able to pass a nuclear stress test and the test was stopped before completion because of dangerously low oxygen levels and amid Plaintiff's physical condition during the test.

61.     Two days later, Plaintiff was sent by his medical providers to the emergency room amid suspicion of blood clots.

62.     After a series of medical appointments, including with a FAA medical examiner, Plaintiff was told that because of damage to his lungs caused by his disability, Plaintiff should not

attempt the medical tests, including a nuclear stress test required to obtain a renewed FAA Medical, at that time.

63.    Initially, Plaintiff's doctors told Plaintiff he could attempt nuclear stress testing and other tests in or about June 2021.

64.    However, amid his disability and related medical conditions/symptoms, Plaintiff was later told by medical doctors that he should not take the medical exams until December, 2021.

65.    Mackey encouraged Plaintiff to take time away from work and continued to pressure him to "get better."

66.    Plaintiff was able to perform all essential functions of his job even though Mackey kept pressuring him to "get better."

67.    In pressuring Plaintiff to "get better," Mackey was falsely suggesting that Plaintiff's disability had a negative impact on the performance of his job duties.

68.    On or about January 25, 2021, during a meeting with Mackey to discuss Plaintiff's 2020 performance evaluation, Mackey encouraged Plaintiff to take short-term disability leave.

69.    Plaintiff had not mentioned any need for short term disability leave before Mackey brought it up.

70.    Mackey told Plaintiff that "Wendy" (Wendy Carruthers ("Carruthers"), Senior Vice President of Human Resources) could "do" the paperwork for Plaintiff.

71.    Mackey promised Plaintiff that he was not trying to "push" Plaintiff "out" of Defendant and that his job would be protected if he took medical leave.

72.    Mackey further asked for detailed information about Plaintiff's medical condition, including a list of any/all doctors treating him.

73.     Shortly after the January 25, 2021, meeting with Mackey, Clark sent short-term disability paperwork to Plaintiff.

74.     Plaintiff had never asked for the paperwork, nor had he ever indicated as of that date he felt qualified for short-term disability leave.

75.     In or about February 2021 Plaintiff took three weeks of vacation to focus on his health and as the intense pressure from Defendant to "get better" continued resulting in stress.

76.     Plaintiff ended up working at least nine (9) of the "vacation" days amid various demands and/or needs of Mackey and the department.

77.     On or about March 1, 2021, Kalled appeared in Plaintiff's office and told him that he "wasn't trying to replace [him]."

78.     Kalled was aware that he had been identified as a successor to Plaintiff on Defendant's formal succession plan.

79.     Kalled took steps to usurp Plaintiff's authority and challenge his leadership within the department.

80.     On or about March 9, 2021, Plaintiff planned to go on a trip (not flying the aircraft) with Mahoney. This was a routine part of his duties in running the department and checking in with his second-level supervisor to ensure that his department was meeting the company's expectations.

81.     Plaintiff routinely went on flights with Mahoney during his tenure with Defendant.

82.     Mackey told Plaintiff he did not want him on the flight with Mahoney.

83.     He further told Plaintiff he needed more information about his "lung scans" and "care pathway."

84.    On or about March 12, 2021, Mackey sent Plaintiff information about his compensation for 2021.

85.    In prior years, Plaintiff's supervisor would always personally review his compensation with him in each new year. Mackey did not review Plaintiff's compensation with him in advance of sending the information.

86.    On or about March 19, 2021, during a Zoom conference with Mackey, Mackey insisted that they review Plaintiff's medical conditions and medical history over Plaintiff's objection.

87.    Mackey told Plaintiff that if he didn't get his FAA Medical back that he "could not work" at Defendant anymore.

88.    Mackey made this statement despite his knowledge that flying was not an essential part of Plaintiff's position.

89.    Mackey didn't offer any other suggestion to Plaintiff for keeping his job other than "getting better."

90.    Mackey also further instructed Plaintiff to continue to "mentor" and train Kalled.

91.    Mackey told Plaintiff that Plaintiff would be required to produce a letter from a doctor stating that Plaintiff would never have any type of medical event while flying an airplane.

92.    Mackey did not require a letter of that nature from any other pilot flying planes for Defendant.

93.    Mackey understood the impossibility of his request as such a certification by a qualified physician would be impossible for any human being to obtain.

94.    Plaintiff understood Mackey to be trying to get Plaintiff to quit or "retire" as he also promised to "take care of [him]" if Plaintiff stopped working for Defendant.

95.    On or about April 1, 2021, Mahoney asked Plaintiff "how [he] was feeling?"

96.    Plaintiff understood Mahoney to be aware of his disability/medical condition even though Plaintiff had not directly communicated with him about same as of that date.

97.    On or about April 8, 2021, amid pressure from Mackey, Plaintiff applied for and was approved for medical leave/covered FMLA leave from the company.

98.    At the time of Plaintiff's medical leave, Plaintiff had already met all his 2021 performance objectives/deliverables.

99.    Plaintiff told Defendant that he did not expect his medical leave to last for more than twelve (12) weeks and that Plaintiff fully planned to return.  Before the twelve weeks passed, Plaintiff's physician cleared Plaintiff to return to work.

100.    On June 22, 2021, Plaintiff sent an email to Mahoney, Mackey and Carruthers notifying them that Plaintiff was medically cleared to return to work.

101.    In that same email, Plaintiff requested the on-going reasonable accommodation of being excused from flying until December 2021 when Plaintiff could take his FAA Medical exam again.

102.    In that same email, Plaintiff complained of age and disability discrimination and provided details related to same.

103.    Plaintiff returned to work on June 28, 2021 at Defendant's Bedford, Massachusetts hangar.

104.    On that same day, Plaintiff had a meeting with Mackey and Clark over Zoom.

105.    Prior to the meeting, on or about June 28, 2021, Plaintiff sent an email to Mackey and Clark containing details related to his complaints of age and disability discrimination.

106.    In that same email, Plaintiff also complained of sex discrimination relating to Defendant's selection of a less-qualified male pilot over a more-qualified female pilot during a hiring process that had recently completed.

107.    Plaintiff believed that the female pilot's sex played a role in her non-selection.

108.    Plaintiff believed he had an obligation under the company's policies to bring information about discriminatory conduct to the company's attention.

109.    During the meeting, Plaintiff provided details to Mackey and Clark supporting his complaints of disability and discrimination.

110.    Plaintiff understood Mackey to be angry during the Zoom upon witnessing Mackey's body language and demeanor.

111.    Plaintiff also shared details related to the essential functions of his job.

112.    Plaintiff reminded Mackey and Clark that flying was not an essential function of the job.

113.    Mackey abruptly ended the Zoom stating "this is over."

114.    Plaintiff otherwise performed full-time work for Defendant during the week of June 28, 2021.

115.    During Plaintiff's medical leave, Defendant made changes to the department organizational chart, removing at least one direct report and one indirect report from Plaintiff and shifting them to Kalled.

116.    In addition, a new pilot was placed under Kalled's supervision when he should have been placed under Plaintiff's supervision.

117.    The organizational chart changes remained after Plaintiff returned from medical leave.

118.    Multiple employees indicated to Plaintiff that they were confused about whether Kalled or he was running the department.

119.    Kalled ignored Plaintiff's supervision and was dismissive of his requests that he comport with department procedures, many of which were in place amid safety compliance concerns.

120.    For example, Kalled did not do a "pass-down form" upon Plaintiff's return to cover the period during which he was purportedly running the department while Plaintiff was on medical leave.

121.    Plaintiff does not believe Kalled would have behaved in such a manner to him, his supervisor, unless he was emboldened to do so by others above Plaintiff within Defendant's organization.

122.    While Plaintiff was on medical leave, Kalled failed to perform critical aspects of his job.

123.    Several important functions were not performed while others were staffed out to employees of equal or lesser rank to Kalled within the organization.

124.    One employee told Plaintiff that Kalled was "in over his head."

125.    Following Plaintiff's meeting with Mackey and Clark, on or about June 29, 2021, he was contacted by Jennifer Schumann ("Schumann") of Defendant's human resources team.

126.    Schumann told Plaintiff she would be investigating his complaints of discrimination and that consistent with company policy he should take paid "vacation" while her investigation was on-going.

127.    Plaintiff participated in Schumann's investigation and provided Schumann with requested information about his disability and age complaints.

128.    Plaintiff also provided information related to Defendant's sex discriminatory failure to hire the female pilot referred to above.

129.    During the investigation Plaintiff again complained of sex, disability and age discrimination in writing and to high-ranking individuals at Defendant, including Mackey and Mahoney.

130.    By mid-July Schumann's explanation of her role and "investigation" shifted.

131.    Schumann now told Plaintiff that she was involved in determining his disability status and whether or not Defendant could grant his accommodation in the form of a brief period of not performing in-flight pilot services while he was waiting to take his FAA Medical exams in December 2021.

132.    On or about July 29, 2021, Schumann told Plaintiff she had concluded her work.

133.    Schuman advised that she was not able to substantiate Plaintiff's claims of discrimination.

134.    Schumann told Plaintiff that Mackey admitted to making comments about Plaintiff's retirement.

135.    Schuman stated that Mackey's comments were intended to give Plaintiff "options" for a transition to retirement in the event that Plaintiff could not return to work because of his health.

136.    Schuman advised that she could see how Plaintiff could have "misunderstood" Mackey's statements.

137.    To the best of Plaintiff's knowledge, despite admitting that he made inappropriate age-based comments, Mackey was not coached, counseled, or disciplined in any manner.

138.     Failing to coach, counsel or discipline a manager who made age-based comments to a subordinate is a violation of Defendant's policies, to the best of Plaintiff's understanding of those policies.

139.     Schumann told Plaintiff that during her investigation into Plaintiff's complaints of discrimination, she concluded that Plaintiff was a toxic manager.

140.     Prior to becoming disabled, Plaintiff had never been told that he was a "toxic" manager, nor had he received any negative feedback about his performance, including his performance as a manager.

141.     Prior to complaining of sex, age or disability discrimination, Plaintiff had never been told that he was a "toxic" manager nor had Plaintiff received any negative feedback about his performance, including his performance as a manager.

142.     Schumann further told Plaintiff that Defendant had concluded that flying was an essential function of his job and that it was not reasonable or sustainable for Defendant to wait five (5) months for him to take his FAA Medical exam.

143.     Defendant did not engage in any interactive process with Plaintiff regarding his request for an accommodation to not fly until December 2021.

144.     Defendant did not offer any alternative to Plaintiff to his request for an accommodation to not fly until December 2021.

145.     Defendant did not offer any detail regarding any assertion that it was "not reasonable" or "not sustainable" for Defendant to grant Plaintiff's reasonable accommodation.

146.     Schumann told Plaintiff she did not see a "path forward" for him at Boston Scientific.

147.   Schumann refused when asked to explain what she meant by saying there was not a path forward for Plaintiff at Boston Scientific.

148.   Schumann told Plaintiff that he could remain employed through March 2022, receive his bonus for 2021, and vesting of certain stock options if he signed certain paperwork.

149.   Plaintiff repeatedly asked Defendant for clarification about his status with Defendant as he wanted to return to work and was medically cleared to do so.

150.   Schumann and Clark eventually, after Plaintiff asked repeatedly what his options were with respect to continuing his employment at Defendant, told Plaintiff that he could sign a general release of all legal claims against Defendant and remain an employee through March, 2022 with all related salary and benefits or Plaintiff could apply for STD coverage through Defendant's STD carrier.

151.   Employees who had not complained of discrimination were not required to sign a general release of any/all legal claims to remain employed.

152.   When Schuman and Clark encouraged Plaintiff to apply for STD coverage through their carrier, they were aware that Plaintiff's medical providers did not believe that Plaintiff was qualified for short-term disability leave.

153.   When Schuman and Clark encouraged Plaintiff to apply for STD coverage through their carrier, they were aware that Plaintiff did not believe that Plaintiff was qualified for short-term disability leave.

154.   Defendant pressured Plaintiff repeatedly into signing the general release or meeting with Schumann or Clark to sign the release/get more information about their "offer."

155.   Repeatedly, Defendant encourage Plaintiff to apply for STD even though he did not qualify, and Plaintiff told Defendant that he did not qualify.

156.    On or about August 5, 2021, Defendant told Plaintiff that if he did not sign a general release of all legal claims or apply for disability even though Plaintiff did not qualify for STD, then his employment would terminate on September 3, 2021.

157.    Plaintiff was terminated by Defendant September 3, 2021.

158.    To the best of Plaintiff's knowledge, a non-complaining, non-disabled, substantially younger employee (Kalled) replaced Plaintiff.

159.    Prior to replacing Plaintiff, Kalled had never had a direct report while employed by Defendant.

160.    Plaintiff passed his FAA medical exams and received his FAA First Class Medical certification, qualifying him to pilot aircraft, in December 2021.

161.    Plaintiff's age was a determinative and/or motivating factor in Defendant's discriminatory conduct, including without limitation, in terminating him.

162.    Plaintiff's actual and/or perceived disability and/or record of impairment was a determinative and/or motivating factor in Defendant's discriminatory and retaliatory conduct, including without limitation, in failing to accommodate him, failing to engage in the interactive process, and terminating Plaintiff.

163.    Plaintiff's need for FMLA leave was a determinative and/or motivating factor in Plaintiff's termination.

164.    Plaintiff's complaints of age, sex and disability discrimination were motivating and/or determinative factor(s) in Defendant's retaliatory conduct, including in connection with failing to accommodate Plaintiff, failing to engage in the interactive process, requiring him to sign a general release of all legal claims in order to remain employed, and terminating Plaintiff.

165.    Defendant retaliated against Plaintiff for invoking his rights to FMLA leave.

166.    As a direct and proximate result of the discriminatory and retaliatory conduct of Defendant, Plaintiff has in the past incurred, and may in the future incur, a loss of earnings and/or earning capacity, loss of benefits, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures.

167.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of the unlawful behavior complained of herein unless and until this Court grants the relief requested herein.

168.    The conduct of Defendant, as set forth above, was outrageous under the circumstances and warrants the imposition of liquidated, treble, and punitive damages against Defendant.

## COUNT I
## (Violation of the ADA)

169.    Plaintiff incorporates herein by reference the paragraphs above as if set forth herein in their entirety.

170.    By committing the foregoing acts of discrimination and retaliation against Plaintiff, Defendant has violated the ADA.

171.    Defendant acted with malice and/or a reckless indifference to Plaintiff's rights, thereby warranting the imposition of punitive damages.

172.    As a direct and proximate result of Defendant's violations of the ADA, Plaintiff has suffered the injuries, damages, and losses set forth herein.

173.    Plaintiff is entitled to all costs and attorneys' fees incurred as a result of the unlawful behavior complained of herein.

174.    No previous application has been made for the relief requested herein.

## COUNT II
### (Violation of the ADEA)

175.     Plaintiff incorporates herein by reference paragraphs above as if set forth herein in their entirety.

176.     By committing the foregoing acts of discrimination and retaliation against Plaintiff, Defendant violated the ADEA.

177.     Defendant's violations of the ADEA were intentional and willful under the circumstances, warranting the imposition of liquidated damages.

178.     As a direct and proximate result of Defendant's violation of the ADEA, Plaintiff has suffered the injuries, damages and losses set forth herein.

179.     Plaintiff is entitled to all costs and attorneys' fees incurred as a result of the unlawful behavior complained of herein.

180.     No previous application has been made for the relief requested herein.

## COUNT III
### (Violation of Title VII)

181.     Plaintiff incorporates by reference each of the preceding paragraphs as if each were set forth herein in its entirety.

182.     By committing the foregoing acts of retaliation against Plaintiff, Defendant has violated Title VII.

183.     Defendant acted intentionally, and with malice and/or reckless indifference to Plaintiff's rights, and its conduct warrants the imposition of punitive damages.

184.     As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

185.   Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's violation of Title VII unless this Court grants the relief requested herein.

## COUNT IV
### (Violation of the FMLA)

186.   Plaintiff incorporates by reference the paragraphs above as if set forth herein in their entirety.

187.   By committing the foregoing acts against Plaintiff, Defendant violated the FMLA.

188.   Defendant, by terminating Plaintiff after using protected leave, has retaliated against Plaintiff and violated the FMLA.

189.   Said violations were willful.

190.   The imposition of liquidated damages is warranted.

191.   As a direct and proximate result of Defendant's violations of the FMLA, Plaintiff has suffered the damages and losses set forth herein.

192.   Plaintiff has incurred and is entitled to reasonable costs and attorneys' fees incurred as a result of the unlawful behavior complained herein.

193.   No previous application has been made for the relief requested herein.

## COUNT V
### (Violation of Chapter 151B)

194.   Plaintiff incorporates herein by reference paragraphs above as if set forth herein in their entirety.

195.   By committing the foregoing acts of discrimination and retaliation against Plaintiff, Defendant has violated Chapter 151B.

21

196.    Defendant engaged in the foregoing acts of discrimination and retaliation against Plaintiff with knowledge or reason to know that such acts violated the provisions of Chapter 151B, warranting the imposition of a doubling or trebling of actual damages.

197.    As a direct and proximate result of Defendant's violation of the Chapter 151B, Plaintiff has suffered the injuries, damages and losses set forth herein.

198.    Plaintiff is entitled to all costs and attorneys' fees incurred as a result of the unlawful behavior complained of herein.

199.    No previous application has been made for the relief requested herein.

### RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant:

(a)    declaring the acts and practices complained of herein to be in violation of the ADA;

(b)    declaring the acts and practices complained of herein to be in violation of the ADEA;

(c)    declaring the acts and practices complained of herein to be in violation of Title VII;

(d)    declaring the acts and practices complained of herein to be in violation of the FMLA;

(e)    declaring the acts and practices complained of herein to be in violation of Chapter 151B;

(f)    entering judgment against Defendant and in favor of Plaintiff in an amount to be determined;

(g)    enjoining and permanently restraining the violations alleged herein;

(h)     awarding compensatory damages to Plaintiff to make Plaintiff whole for all past and future lost earnings, benefits and earning capacity, which Plaintiff has suffered and will continue to suffer as a result of Defendants' discriminatory and unlawful misconduct;

(i)     awarding liquidated damages;

(j)     awarding compensatory damages to Plaintiff for past and future emotional upset, mental anguish, humiliation, loss of life's pleasures, and pain and suffering;

(k)     awarding punitive damages;

(l)     doubling or tripling of damages as provided for by Massachusetts law;

(m)     awarding Plaintiff costs of this action, together with reasonable attorneys' fees;

(n)     awarding Plaintiff other such damages as are appropriate under the ADA, the ADEA, TITLE VII, the FMLA, and Chapter 151B

(o)     granting such other and further relief as this Court deems appropriate.


                                    **CONSOLE MATTIACCI LAW, LLC**


Dated: May 6, 2022                  BY: _____
                                         Katherine C. Oeltjen, Esquire (BBO# 662623)
                                         1525 Locust Street, 9th Floor
                                         Philadelphia, PA 19102
                                         (215) 545-7676
                                         (215) 565-2852 (fax)

# EXHIBIT 1

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See privacy statement before consolidating this form. | ☐ FEPA<br>X EEOC | |

| STATE OR LOCAL AGENCY:  MCAD | | |
|---|---|---|

| NAME (Indicate Mr., Ms., Mrs.)<br>Mr. Robert Harpin | | HOME TELEPHONE NUMBER (Include Area Code)<br>REDACTED |
|---|---|---|

| STREET ADDRESS<br>REDACTED | CITY, STATE AND ZIP<br>Litchfield, CT 06759 | DATE OF BIRTH<br>REDACTED |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP, COMMITTEE, STATE OF LOCAL GOVERNMENT WHO DISCRIMINATED AGAINST ME (If more than one than list below)

| NAME<br>Boston Scientific Corporation | NUMBER OF EMPLOYEES,<br>MEMBERS: More than 30,000 | TELEPHONE (Include Area Code)<br>(508) 683-4000 |
|---|---|---|
| STREET ADDRESS<br>300 Boston Scientific Way | CITY, STATE AND ZIP<br>Marlborough, MA 01752 | COUNTY<br>Middlesex |

| CAUSE OF DISCRIMINATION (Check appropriate box(es))<br>☐ Race   **X** Sex   ☐ Religion   ☐ National Origin<br>**X** Retaliation   **X** Age   **X** Disability   ☐ Other (Specify) | DATE DISCRIMINATION TOOK PLACE<br>Latest Date September 3, 2021 |
|---|---|

## A. THE PARTICULARS ARE:

### 1. Relevant Work History

I was hired by Boston Scientific Corporation ("Respondent") in or about February 2017 as Director of Aviation. As Director of Aviation, I was charged with managing all aspects of Respondent's global flight operations, including but not limited to, safety, training, maintenance and security. In addition, I was responsible for formulating and implementing safety management systems, processes and procedures and generally managing a business unit that supported global aviation operations servicing one-hundred and fifty-two (152) unique destinations per year. I was told by Respondent's CEO, Michael F. Mahoney ("Mahoney") (non-disabled)[1] (55) during the hiring process that he "did not care" if I performed in-flight pilot services for Respondent in addition to the other job duties associated with Director of Aviation.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures | NOTARY - (when necessary for State and Local Requirements)<br><br>I swear of affirm that I have read the above charge and that it is true to the best of my knowledge information and belief. |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. | |
| <br>Date: 9/21/21   Charging Party (Signature) | SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day Month, and year) |

---

[1] Allegations as to age and disability status, other than my own, are made to the best of my information and belief.

**Relevant Work History (Cont'd)**

Though it was not an essential function of my job, I did perform in-fight pilot services for Respondent.

I initially reported to Respondent's then General Counsel, Tim Pratt ("Pratt") (non-disabled) (55). Pratt reported to Mahoney. Beginning in or about February 2018, I began reporting to Ed Mackey, Executive Vice President Global Operations ("Mackey") (non-disabled) (57). Mackey reported to Mahoney. I routinely interacted with Mahoney. Mahoney's feedback about my performance was included in my performance evaluation each year. I was based in Respondent's Bedford, Massachusetts location.

At all material times, I had approximately nine (9) direct reports and one additional employee who reported to me indirectly. My direct reports included Ryan Kalled ("Kalled"), Pilot, Fellow (non-disabled) (37). I had operational authority for a budget of approximately $8.9 Million each year.

I have consistently performed my job in an exemplary manner. I have, without exception, received merit raises and bonuses throughout my employment. In addition, and without limitation, I have also: received internal and external recognition for keeping Respondent's Puerto Rico operations on track at 90-99% of routine in the days immediately following a devastating hurricane; increased Respondent's usage of its jet with efficiency to glowing praise from internal users resulting in cost and efficiency savings to Respondent; been awarded a "BSC Recognize Success" distinction; achieved a carbon neutral footprint (a stated company goal) for my department, one of only two departments within the company to achieve that status; and achieved DE&I (Diversity, Equity and Inclusion) goals provided by the company through the creation of the Dream Day Program.

## 2. Personal Harm

I believe that Respondent has discriminated against me because of my age (66), and disability (post-acute sequelae of Covid-19 sometimes referred to as "Long-Covid"). Symptoms of my disability include but are not limited to the following: fatigue/exhaustion, shortness of breath, joint pain, nausea, changes to my ability to taste normally, and facial and skin pain. I also experience changes in my oxygen saturation levels in an unpredictable manner. I believe that Respondent has retaliated against me for my complaints of sex, age, and disability discrimination, requiring/requesting medical leave, and for requesting reasonable accommodations because of my disability.

Evidence of Respondent's discriminatory and retaliatory conduct includes, but is not limited to the following:

a. I was the oldest employee in the aviation unit.

**Harpin v. Boston Scientific**
**EEOC CHARGE OF DISCRIMINATION**
**Page 3 of 10**

b.  I was the oldest employee reporting to Mackey and the oldest of Mahoney's second-level reports.

c.  On or about December 13, 2019, I had hip surgery.

d.  Respondent, including Mackey, was aware of my hip surgery.

e.  I returned to work (remotely) on December 16, 2019.

f.  Because of my surgery and recovery, I did not have my "FAA Medical" and thus was not able to fly aircraft for Respondent.

g.  FAA Medical certification is required by law to pilot aircraft.

h.  I worked full-time (in excess of forty (40)) hours per week without performing any in-flight pilot services for Respondent between December 16, 2019, and June 6, 2020.

i.  On or about May 28, 2020, I obtained my FAA Medical and was cleared to fly.  For people over the age of forty, a First Class FAA Medical is valid for approximately six (6) months.

j.  In or about July 2020, Mackey told me that "he wasn't supposed to ask me this" but "Mike" (referring to Mahoney) asked Mackey about his retirement plans so he was going to "ask [me]." Mackey then asked me when I planned to retire. I understood Mackey to be asking me when I planned to retire because of my age at the time (65).

k.  At all material times, I understood Mackey to consider Kalled to be a "successor" to me. Kalled appeared on the company's formal "succession" plans as a potential successor to me.

l.  Kalled was aware that he was identified as a successor to me.

m.  In or about November 2020, I was exposed to a Covid positive employee of Respondent.

n.  That same month, I contracted Covid-19.

o.  During my infectious period with Covid, I worked throughout—albeit remotely.

p.  By late November, though I was no longer ill with an active viral infection of Covid-19, I experienced a number of medical symptoms that generally fall into the category of "Long-Covid" and are consistent with the symptoms and disability described above.

q.  Mackey put tremendous pressure on me to "get better" (something beyond my control), resulting in a negative impact to my health and creating a hostile work environment. On

or about November 19, 2020, Mackey told me over Zoom that if I didn't get better, he would "terminate [me] from this enterprise."

r.  I shared Mackey's comment with my team and with Denise LaMirande Clark ("Clark"), Director Human Resources.

s.  My FAA Medical expired on or about November 30, 2020. I was not able to renew my FAA Medical in advance of the expiration date because of my active viral infection with Covid-19.

t.  On or about December 16, 2020, I went to a medical appointment necessary for me to renew my FAA Medical. I was not able to pass a nuclear stress test and the test was stopped before completion because of dangerously low oxygen levels and amid my physical condition during the test.

u.  After a series of medical appointments, including an FAA medical examiner, I was told that amid damage to my lungs caused by my disability, I should not attempt the medical tests, including a nuclear stress test required to obtain a renewed FAA Medical, at that time.

v.  Initially, my doctors told me I could attempt nuclear stress testing and other tests in or about June 2020, however, amid my disability and related medical conditions/symptoms, I was later told by medical doctors that I could not take the medical exams until December, 2021.

w.  Mackey encouraged me to take time away from work and continued to pressure me to "get better."

x.  I was able to perform all essential functions of my job even though Mackey kept pressuring me to "get better."

y.  On or about January 25, 2021, during a meeting with Mackey to discuss my 2020 performance evaluation, Mackey encouraged me to take short-term disability leave. I had not mentioned any need for short term disability leave before Mackey brought it up. Mackey told me that "Wendy" (Wendy Carruthers ("Carruthers"), Senior Vice President of Human Resources) could "do" the paperwork for me.

z.  Mackey further asked for detailed information about my medical condition, including a list of any/all doctors treating me.

aa. I received positive comments and feedback about my 2020 performance.

bb. Shortly after the January 25, 2021, meeting with Mackey, Clark sent me short-term disability paperwork. I had never asked for the paperwork, nor had I ever indicated as of that date that I felt qualified for short-term disability leave.

cc. In or about February 2021 I took three weeks of vacation in order to focus on my health and as the intense pressure from Respondent to "get better" continued. I ended up working at least nine (9) of the "vacation" days amid various demands and/or needs of Mackey and the department.

dd. On or about March 1, 2021, Kalled appeared in my office and told me that he "wasn't trying to replace me."

ee. Kalled was aware that he had been identified as a successor to me on Respondent's formal succession plan. Kalled took steps to usurp my authority and challenge my leadership within the department.

ff. In or about March, 2021, I was supervising Kalled in connection with the hire of a new co-pilot.

gg. A female candidate most closely met the qualifications and objectives established by the Respondent.

hh. Kalled wanted to hire a male candidate for the position. The male candidate did not meet certain of Respondent's qualifications and objectives for the position. In addition, the male candidate, though a Captain, was not certified on the type of aircraft owned by Respondent and would thus require a training/certification that would cost Respondent tens of thousands of dollars. The female candidate was already certified on the aircraft owned by Respondent.

ii. When I instructed Kalled that Respondent should hire the female candidate amid her qualifications to Respondent's requirements and her certification, Kalled stated told me that he didn't need to hire anyone he didn't want to hire because "unlike [me] he knew more than one person at the company".

jj. Respondent hired the male candidate.

kk. I believe that the sex of the female candidate was a reason for her not receiving the job.

ll. On or about March 9, 2021, I planned to go on a trip (not flying the aircraft) with Mahoney. This was a routine part of my duties in running the department and checking in with my second-level supervisor to ensure that my department was meeting the company's expectations. I routinely went on flights with Mahoney during my tenure with Respondent.

mm. Mackey told me he did not want me on the flight with Mahoney. He further told me he needed more information about my "lung scans" and "care pathway."

nn. On or about March 12, 2021, Mackey sent me information about my compensation for 2021. In prior years, my supervisor would always personally review my compensation with me in each new year.

oo. My 2021 compensation increased over my 2020 compensation. My 2020 performance review was positive.

pp. On or about March 19, 2021, during a Zoom conference with Mackey he insisted that we review my medical conditions and medical history over my objection.

qq. Mackey told me that if I didn't get my FAA Medical back that I "could not work" at Respondent anymore despite his knowledge that flying was not an essential part of my position.

rr. Mackey also further instructed me to continue to "mentor" and train Kalled.

ss. Further, Mackey told me that unlike every other pilot in the company's employ, in addition to my FAA medical, I would be required to produce a letter from a doctor stating that I would never have any type of medical event while flying an airplane.

tt. Mackey understood the impossibility of his request as such a certification by a qualified physician would be impossible for any human being to obtain.

uu. I understood Mackey to be trying to get me to quit or "retire" as he also promised to "take care of me" if I stopped working for Respondent.

vv. On or about April 1, 2021, Mahoney asked me "how [I] was feeling?" I understood Mahoney to be aware of my disability/medical condition even though I had not directly communicated with him about same.

ww. On or about April 8, 2021, amid pressure from Mackey, I applied for and was approved for medical leave from the company.

xx. At the time of my medical leave, I had already met all my 2021 performance objectives/deliverables.

yy. I told Respondent that I did not expect my medical leave to last for more than twelve (12) weeks and that I fully planned to return.

zz. I applied for salary continuation under Respondent's short-term disability insurance policy.

aaa. Before the twelve weeks passed, my physician cleared me to return to work.

bbb. On June 22, 2021, I sent an email to Mahoney, Mackey and Carruthers notifying them that I was medically cleared to return to work.

ccc. In that same email, I requested the on-going reasonable accommodation of being excused from flying until December 2021 when I could take my FAA Medical exam again.

ddd. In that same email, I complained of age and disability discrimination and provided details related to same.

eee. I returned to work on June 28, 2021.

fff. On that same day, I had a meeting with Mackey and Clark.

ggg. Prior to the meeting, on or about June 28, 2021, I sent an email to Mackey and Clark containing details related to my complaints of age and disability discrimination.

hhh. In that same email, I also complained of sex discrimination relating to Respondent's selection of the male pilot over a female pilot as described above.

iii. During the meeting, I provided details to Mackey and Clark supporting my complaints of disability and discrimination.

jjj. I also shared details related to the essential functions of my job. I reminded Mackey and Clark that flying was not an essential function of the job.

kkk. I otherwise performed full-time work for Respondent during the week of June 28, 2021.

lll. During my medical leave, Respondent made changes to the department organizational chart, removing at least one direct report and one indirect report from me and shifting them to Kalled. In addition, the new male co-pilot was placed under Kalled's supervision when he should have been placed under my supervision.

mmm.The organizational chart changes remained after I returned from medical leave.

nnn. Multiple employees indicated to me that they were confused about whether Kalled or I was running the department.

ooo. Kalled ignored my supervision and was dismissive of my requests that he comport with department procedures, many of which were in place amid regulatory compliance concerns. For example, Kalled did not do a "pass-down form" upon my return to cover the period during which he was purportedly running the department.

ppp. I do not believe Kalled would have behaved in such a manner to me, his supervisor, unless he was emboldened to do so by others above me within Respondent's organization.

qqq. While I was on medical leave, Kalled failed to perform critical aspects of my job.

rrr. Several important functions were not performed while others were staffed out to employees of equal or lesser rank to Kalled within the organization. One employee told me that Kalled was "in over his head."

sss. Following my meeting with Mackey and Clark, on or about June 29, 2021, I was contacted by Jennifer Schumann ("Schumann") of Respondent's human resources team.

ttt. Schumann told me she would be investigating my complaints of discrimination. She further told me that it was "routine" for a complaining employee to take paid vacation leave while the investigation proceeded.

uuu. I reminded Schumann that I wanted to be at work and perform my job.

vvv. Schumann assured me that paid "vacation" during her investigation was not punitive in any way.

www. With assurance that the paid leave was standard and not punitive, I followed Schumann's instruction and took leave. Yet, while I was on paid leave, I continued to perform work for Respondent, including in connection with onboarding and training functions needed for a new pilot.

xxx. I provided Schumann additional information about my disability and age complaints and also provided information related to Respondent's sex discriminatory failure to hire the female pilot referred to above. During the investigation I again complained of sex, disability and age discrimination.

yyy. By mid-July Schumann's explanation of her role and "investigation" shifted. Schumann now told me that she was involved in determining my disability status and whether or not Respondent could grant my accommodation.

zzz. Schumann also changed her initial assertion that I was being placed on non-punitive paid vacation to instead assert for the first time that I was being placed on leave because Respondent didn't think I was cleared to work.

aaaa. My medical provider had cleared me to return to work.

bbbb. At or around the same time, Respondent's third-party short term disability carrier opened my leave (it had been closed upon my return to work) again without my permission or my request that it do so.

cccc. On or about July 29, 2021, Schumann told me she had concluded her work. Schuman advised that she was not able to substantiate my claims of discrimination. Schuman stated

that Mackey gave me options for a transition to retirement in the event that I could not return to work because of my health. Schuman advised that she could see how I could have misunderstood Mackey's statements. Schumann told me that during the course of her investigation of my complaints she concluded that I was a toxic manager.

dddd. Prior to becoming disabled I had never been told that I was a "toxic" manager nor had I received any negative feedback about my performance.

eeee. Prior to complaining of sex, age or disability discrimination, I had never been told that I was a "toxic" manager nor had I received any negative feedback about my performance.

ffff. Schumann further told me that Respondent had concluded that flying was an essential function of my job and that it was not reasonable or sustainable for Respondent to wait five (5) months for me to take my FAA Medical exam.

gggg. Schumann told me she did not see a "path forward" for me at Boston Scientific.

hhhh. Schumann refused when asked to explain what she meant by saying there was not a path forward for me at Boston Scientific.

iiii. Schumann told me that I could continue on paid leave until March 2022, receive my bonus for 2021, and my stock options would vest in March 2022 if I signed certain paperwork.

jjjj. I repeatedly asked Respondent for clarification about my status with Respondent as I wanted to return to work and was medically cleared to do so.

kkkk. Schumann and Clark eventually told me that I could sign a general release of all legal claims against Respondent and receive salary continuation through March, 2022 plus an additional three months of severance or I could apply for short term disability coverage through their carrier despite their knowledge that my medical providers did not believe I qualified for such leave.

llll. Respondent pressured me repeatedly into signing the release or meeting with Schumann or Clark to sign the release/get more information about their "offer."

mmmm. Repeatedly, Respondent encourage me to apply for STD even though I did not qualify, and I told Respondent that I did not qualify.

nnnn. On or about August 5, 2021, Respondent told me that if I did not sign a general release of all legal claims or apply for STD even though I did not qualify for STD, then my employment would terminate on September 3, 2021.

oooo. My employment terminated September 3, 2021.

pppp.   To the best of my knowledge, a non-complaining, non-disabled, substantially younger employee (Kalled) is performing my job duties.

### B.  Respondent's Stated Reason

Respondent has not provided a non-pretextual, legitimate non-discriminatory reason for the discriminatory and retaliatory treatment to which I have been subjected, including in connection with a hostile work environment, diminution of my duties, failure to provide a reasonable accommodation, and termination. The reason provided by Respondent, that I was a "toxic" manager, is false-and pretextual for discrimination and retaliation.

### C.  Statutes and Bases of Allegations

I believe Respondent has discriminated against me based on my age and disability and retaliated against me for my complaints of age, disability and sex discrimination in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. §621, *et seq.* ("ADEA"), the Americans with Disabilities Act, 42 U.S.C. §12101, *et seq.* ("ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and Mass. General Laws c.151B *et. seq.*, as set forth herein.

# EXHIBIT 2

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Boston Area Office**
15 New Dudbury St ,Room 475
Boston ,Massachusetts ,02203
(617) 865-3670
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 03/23/2022

**To:** Mr. Robert Harpin
REDACTED
Litchfield, CT 06759

Charge No: 523-2021-02352

EEOC Representative and email:       Anthony Pino
                                     Enforcement Supervisor
                                     Anthony Pino@eeoc.gov

### DISMISSAL OF CHARGE

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 523-2021-02352.



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Boston Area Office**
15 New Dudbury St ,Room 475
Boston ,Massachusetts ,02203
(617) 865-3670
Website: www.eeoc.gov

### On Behalf of the Commission:

Digitally Signed By:Judy Keenan
03/23/2022

Judy Keenan
District Director

**Cc:**
Grace E Speights
Partner
Morgan Lewis
grace.speights@morganlewis.com
Elizabeth Hendler
Chief Employment Counsel
BOSTON SCIENTIFC CORPORATION
Elizabeth.Hendler@bsci.com

Katherine C Oeltjen
CONSOLE MATTIACCI LAW, LLC
oeltjen@consolelaw.com

Danielle Buccieri
ParalegalCONSOLE MATTIACCI LAW, LLC
buccieri@consolelaw.com

Please retain this notice for your records.